**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHARLYN FOO | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF STATE, JOHN | ) | |
| KERRY, in his official capacity as United | ) | |
| States Secretary of State, acting by and through | ) | |
| the FOREIGN SERVICE GRIEVANCE | ) | |
| BOARD, and CHRISTOPHER H. FLAGGS, | ) | |
| Comptroller of the Department, Bureau of the | ) | |
| Comptroller and Global Financial Services, | ) | |
| United States Department of State | ) | |
| | ) | |
| *Defendants*. | ) | |

**COMPLAINT**

Plaintiff SharLyn Foo hereby brings this action, pursuant to 22 U.S.C. § 4140(a), for

judicial review of final agency decision of the Foreign Service Grievance Board, and pursuant to

28 U.S.C. §§ 2201-2202 for declaratory relief.

**INTRODUCTION**

1.      Plaintiff SharLyn Foo ("Plaintiff" or "SharLyn") hereby seeks review of the

decisions of the Foreign Service Grievance Board ("the Board").  The U.S. Department of State

("State Department") made erroneous payments to the account of a late widow (Lorna Foo) of

annuitant (Charles Foo), a former federal employee.  The payments were made to the account of

SharLyn, daughter of the former federal annuitant (Charles), after the death of her mother Lorna.

2.      Despite having no knowledge about the genesis of the purported annuity

overpayments, the State Department has demanded that SharLyn repay approximately $300,000,

even though the State Department is the only party at fault.

3.      On October 17, 1980, the Foreign Service Act of 1980 was enacted.  Pub. L. No. 96-465, 94 Stat. 2071 (Oct. 17, 1980).  The Act established the Foreign Service Retirement and Disability System, to be administered by the Secretary of State.  *Id.* § 801 (codified at 22 U.S.C. § 4041).

4.      Recognizing that the State Department may make errors in managing its retirement system—similar to the error it made with SharLyn here—Congress provided that instructed that "[r]ecovery of overpayments under this chapter may not be made from an individual when, in judgment of the Secretary of State, the individual is without fault and recovery would be against equity and good conscience or administratively infeasible."  Pub. L. No. 96-465 § 807(d) (codified at 22 U.S.C. § 4047(d)).

5.      In accordance with the Act, when an individual receives an overpayment from the State Department, and when that individual is not at fault, that individual is relieved from reimbursing the State Department for its error when "recovery would be against equity and good conscience or administratively infeasible."  22 U.S.C. § 4047(d).

6.      In this case, SharLyn Foo was not at fault and any recovery of the alleged annuity overpayments should be waived because "recovery would be against equity and good conscience or administratively infeasible."

7.      The Board denied SharLyn's waiver by making factual findings and legal conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## NATURE OF THE ACTION

8.      This is an action for judicial review of the final decisions of the Foreign Service Grievance Board and the U.S. Department of State, pursuant to 28 U.S.C. § 4140(a), in

accordance with Administrative Procedure Act.  This is also an action for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 22 U.S.C. § 4140(a), pursuant to which review is governed by 5 U.S.C. § 706 of the Administrative Procedure Act.

10.     Venue is proper under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.  Defendants reside in this district and events or omissions relevant to the claim occurred substantially in this district.

## THE PARTIES

11.     Plaintiff SharLyn Foo ("SharLyn Foo") is a resident of Honolulu, Hawaii.

12.     Defendant John Kerry is being sued in his official capacity as the U.S. Secretary of State.

13.     Defendant Christopher H. Flaggs is being sued in his official capacity as Comptroller of the Department, Bureau of the Comptroller and Global Financial Services, United States Department of State.

14.     Defendant Foreign Service Grievance Board is an independent board, established by 22 U.S.C. § 4136, *et seq.*, with jurisdiction to hear challenges by concerning the alleged recovery of overpayments of annuities.

15.     Defendant the U.S. Department of State is a department of the United States of America and is being sued as the department responsible for the actions specified herein.

## STATEMENT OF FACTS

### SharLyn Foo and the Genesis of the Annuity Payments

16.     Lorna Foo ("Lorna") was the wife of the late Charles T. Foo, a former employee of the Foreign Service. Charles and Lorna had three children, including Wayne, SharLyn, and Mark Foo.  Wayne was born in approximately 1946. SharLyn was born on April 17, 1955.  Mark was born on February 5, 1958.  Mark Foo would later become a world-renowned surfer, until his tragic death at the Mavericks, California, on December 23, 2004.

17.     As a benefit for his employment with the Foreign Service, Charles had received a retirement annuity after he retired from service.  At some time prior to his death, he apparently elected to reduce his annuity to provide a survivor benefit for his wife Lorna.  Charles passed away on November 22, 1997, at the age of 69, thus triggering the survivor annuity for Lorna. The survivor annuity was allegedly deposited into an account in First Hawaiian Bank.

18.     After her husband's passing, Lorna, as the matriarch of the family, assumed responsibilities of the family finances.  From at least 1984 until 1997, Lorna resided in Honolulu, Hawaii.  Lorna's financial responsibilities included being the trustee of Charles's estate after he passed away in 1984.  Lorna would later assist with the disposition of her son Wayne's estate in 1991 and the disposition of her other son Mark's estate in 1994.  Lorna also took an active role in her grandchildren's lives, including the lives of SharLyn's children.

19.     SharLyn Foo was born in Michigan in 1955.  She attended college for one year at the University of Maryland and one year at the University of Hawaii but did not complete her degree.  She moved to Hawaii in 1987 because of her father's illness.  She was raised with her parents (when her father was not traveling) and two brothers, Wayne and Mark.

20.     In 1991, Wayne Foo died.  Wayne was SharLyn's older brother.   Wayne was Lorna's son from her first marriage—an arranged marriage.  Charles Foo legally adopted Wayne when Wayne was younger than five years old.  SharLyn always considered Wayne her true brother.  When he was in his twenties, Wayne was diagnosed with hepatitis C, contracted during his time in the military.  Wayne had always wanted to become a doctor, but his health hindered him.  Later, he earned a Master's degree from Georgetown University in Washington, D.C. After his health temporarily improved, he returned to Georgetown and started medical school at the age of 45, approximately.  He married, had two children, Joshua and Selena, and settled in Fairfax, Virginia.  Wayne's disease returned a year after he started in private practice in obstetrics.  He passed away after an arduous fight.

21.     Joshua was Lorna's first grandchild.   As the grandchild, Joshua would spend summers in Hawaii with his grandmother Lorna.  Lorna felt that, since the Foos had their own property, she wanted Joshua to inherit the condo he had spent time in.  After Lorna passed, SharLyn told her sister-in-law Jenny (Joshua's mother) about Lorna's wishes about the condo.

22.     Just three years later, in 1994, SharLyn's younger brother Mark died.  Mark was born in Singapore when Charles and Lorna lived there (because Charles had been stationed there).  In 1968, when Mark was ten years old, the family relocated to Hawaii, where he spent his early years surfing the South Shore of O'ahu.  After several more moves, the Foo family returned to Hawaii.  Through his later teen years and early adulthood, Mark became a world famous surfer, participating in the IPS World Tour.

23.     Around 1978-79, Mark founded a business originally named Waimea Surf and Bed.  He had moved to the North Shore of O'ahu to pursue his dream of surfing professionally. Mark considered the North Shore of O'ahu to be the "mecca" of surfing.  At that time, there were

few places for visitors to stay on the North Shore, and surfers would camp on the beaches. Mark therefore started renting out rooms—and even hallways—in his house. Mark's place quickly became known to surfers as "Foo's Zoo," the place to stay on the North Shore.

24.     Mark's business was later named Backpackers Vacation Inn & Hostel. The business provides low cost accommodations for surfers and tourists looking to enjoy the North Shore. Tragically, Mark died on December 23, 1994, while surfing at Mavericks in Northern California. Today, Mark is still remembered as a pioneer in elevating the popularity of surfing.

25.     Both Wayne and Mark were important figures in SharLyn's life. Wayne was SharLyn's older brother, and Mark was her younger brother. Both brothers were active in her life, as she was in their lives. The loss of both her brothers within a three-year period was a catastrophic loss to SharLyn.

26.     After Mark's death at the end of 1994, SharLyn assumed a more active role in the management of the business. Prior to Mark's death, SharLyn had been involved in the management and daily running of the business. SharLyn, together with her then-husband, was involved in various aspects of managing the business, including maintaining the properties, handling reservations, and attending to the needs of the guests.

27.     During this same time, SharLyn's children were quite young. SharLyn had primary responsibility for caring for and raising her children.

28.     SharLyn had also inherited two properties from Mark when he died. One property had to be sold at a loss because she could not afford to pay the substantial mortgage payments. Prior to selling the property at a loss, SharLyn had to refinance the property to get funds to pay what she owed her ex-husband as part of the divorce decree.

29.     For the second property, SharLyn was able to make the mortgage payments for several years but ultimately had to sell the property to prepare for college payments for her children.

30.     In approximately 1996, the matriarch Lorna became ill.  Lorna was diagnosed that year with lung cancer.  At this point, SharLyn was the only surviving member of the immediate Foo family, besides her mother.  SharLyn tended to her mother, all while going through her own divorce and caring for her own children, then aged approximately 4 and 7.  There were lots of doctors and multiple hospital stays and surgeries.  For the last six months of Lorna's life, she lived with a hole in her chest and drainage tube.  Her daughter SharLyn effectively became her fulltime caregiver and nurse—changing dressings, administering intravenous antibiotics, and attending to all other needs and desires of a terminally ill mother.

31.     During her period of illness, and some years before, Lorna had told SharLyn the plans for Lorna's trust and estate.  One of the accounts at issue was a checking account at First Hawaiian Bank ("the First Hawaiian Bank Account").  Lorna informed SharLyn that the monthly payments were being deposited into the First Hawaiian Bank Account.

### SharLyn's Mother Does Not Inform SharLyn About the Nature of the Monthly Payments

32.     Until June 2012, SharLyn had the understanding that the First Hawaiian Bank Account was in Lorna's name only and that SharLyn only had signing authority on the account. SharLyn believed it was her mother's individual account because only Lorna's name appeared on the checks.  SharLyn was added to the account in 1995 when Lorna became ill.  SharLyn did receive bank statements for the account after her mother passed away, but SharLyn assumed that the name on the check correctly identified ownership of the First Hawaiian Bank Account. Lorna also informed SharLyn that, after Lorna's death, the monthly payments would continue to

be made into the First Hawaiian Bank Account.  SharLyn understood that her mother wanted the *status quo* maintained, *i.e.*, that the monthly payments would be deposited into the First Hawaiian Bank Account for the purpose of satisfying the mortgage and condominium fees for Lorna's condominium.

33.     Lorna even instructed SharLyn not to use Lorna's life insurance proceeds to pay the condominium fees, mortgage, or utility payments because the monthly retirement payments could cover the monthly condominium expenses.  The condominium was to be maintained by SharLyn for the benefit of Lorna's grandchild, Josh Foo, after Lorna's death.

34.     As her only surviving child, SharLyn was to be the trustee and beneficiary of Lorna's estate.   Lorna also gave her daughter instructions about Lorna's condominium apartment.  SharLyn was told by Lorna that the monthly deposits would continue to be deposited into the First Hawaiian Bank Account and that the mortgage and the condo fees would be automatically deducted from that account.  Lorna instructed that SharLyn was to maintain the apartment for Joshua Foo, who was younger than 18 years old at the time.

35.     Lorna never told SharLyn that the monthly deposits would or should cease upon Lorna's death.

36.     Knowing that her mother has primary responsibility for the family's financial estate, SharLyn had no reason to doubt Lorna's instructions.  Lorna never informed SharLyn about the nature of the monthly payments that were allegedly deposited into the First Hawaiian Bank Account.

37.     After Lorna's death, her accountant Janice Chadwick handled the tax resolution of Lorna's property, much of which was held in trust.  It did not proceed through probate because Lorna's property was covered by a revocable trust and a will. Lorna's accountant closed and

filed the final trust tax return sometime after Lorna's death, but presumably within the year. After Lorna's death, the Social Security Administration timely ceased payments to Lorna.

38.     In accordance with her mother's instructions, SharLyn left the condo as it was. SharLyn further notified her sister-in-law, Jenny, about Lorna's bequest and continued with the deposit and mortgage payments as she instructed.  SharLyn left the condo in her mother's name. Lorna had instructed SharLyn to transfer the apartment to her nephew Josh after the mortgage was paid off and he had reached his majority.

39.     During her mother's illness and death, SharLyn was proceeding through an extremely acrimonious divorce.  SharLyn and her then-husband were divorcing in large part due to his infidelity with the nanny.  SharLyn's divorce was finalized approximately three months after her mother's death.

40.     The divorce, combined with Lorna's death, created extreme stress for SharLyn. Pursuant to the divorce court proceedings, the family property that SharLyn's husband had browbeaten her into signing over to him was returned to SharLyn.  Because SharLyn's ex-husband had minimal income, the court ordered him to pay only $50 per month per child in child support.  Additionally, SharLyn had to pay off the ex-husband's credit card debt of $50,000. SharLyn's home property was also burdened with a substantial mortgage; according to the divorce decree, SharLyn was ordered to refinance the properties in her name.  It took several years to do so.

41.     SharLyn's divorce left her as a single mother with the primary responsibility of caring for two young children.  In addition, SharLyn became the sudden owner of a family business that was teetering on financial ruin.

42.     Throughout the years following her divorce and her mother's death, SharLyn ensured that her children remained in school.  To do so, SharLyn and the children would stay in Honolulu at the condominium during the week.

43.     The only way she could have used the condominium in such as manner was based on the fact that the retirement payments were going directly to cover the costs of the condominium.  If SharLyn had known that she was not to receive the payments, then she could have—and would have—rented the condominium to cover the costs of the property.  Indeed, once the annuity payments ceased in 2011, SharLyn started renting the condominium at a rate of approximately $1,600 per month.

44.     Her late mother's condominium unit had been left in Lorna's name, in accordance with Lorna's instructions.  In 2002, SharLyn was informed that this situation might need to be revisited.  One of SharLyn's friends was a mortgage broker.  She told SharLyn that she should transfer the condo out of her mother's name because the mortgage holder could possibly call in the mortgage due to Lorna's death.   Having learned this, SharLyn transferred title of the condominium into her name.  She also took out a loan for the remaining balance of the mortgage.  SharLyn also did not take out any cash from the equity.  SharLyn's purpose for doing this was to comply with her late mother's wishes and ensure that her nephew would receive his inheritance.

45.     In approximately 2007, due to her financial situation, SharLyn was forced to sell her brother Mark's former home in Haleiwa, Hawaii.  (SharLyn had inherited Mark's house when Mark died in 1994.)  At that time, SharLyn had little to no savings and no retirement plan.  Her two children were approaching college age, with significant tuition expenses expected. Thus, she sold the property in order to start her retirement account. In doing so, she paid a substantial amount of tax based on the sale.

46.     Due to the 2008 recession, SharLyn had to transfer over a substantial amount of money from her retirement fund into the family business to cover mortgages and expenses.  For several years, business was down.  SharLyn also reduced her salary at least one time in order to keep the business viable.   Further investments were necessary.   SharLyn had to consider undertaking significant infrastructure-related investments to comply with requirements relating to cesspools and septic tanks.

47.     At the time of filing the appeal to the Board, SharLyn did not have a retirement fund.  She estimated that she will need to cover expenses for several more years as well as continue to pay college tuition for her children.  SharLyn also has numerous other expenses which consume much of her income.  For example, she has paid her son's college tuition; health insurance of approximately $1,000 per month for the family (three individuals); utilities of approximately $600 per month; car insurance per year; food per month; gas for her car; and other miscellaneous expenses.

### In 2012, SharLyn Learns for the First Time That the State Department Had Erred in Continuing to Deposit the Annuity Payments

48.     In January 2012, SharLyn received a phone call from Secret Service Agent Daniel Yang.   Agent Yang asked that SharLyn meet with him and his partner to discuss Lorna's account.   The out-of-the-blue call from the Secret Service was alarming, confusing, and frightening to SharLyn.   Thinking that the request for a meeting might be a scam, SharLyn requested that they meet at a safe public place, the local McDonald's in Haleiwa.

49.     During this meeting, Agent Yang informed SharLyn that, since Lorna's death in 1997, certain government monies, specifically an "annuity," deposited into the First Hawaiian Bank Account account were supposed to have stopped upon Lorna's death.  SharLyn responded

that she was not sure what an annuity was and that she did not know anything about an annuity. Agent Yang asked that SharLyn write a statement, which she did.

50.     Neither Agent Yang nor his partner provided SharLyn with any paperwork or documentation concerning the alleged annuity overpayments.

51.     Sometime after the meeting, the Secret Service apparently concluded that no fraud or criminal activity occurred.  Agent Yang apparently concluded that SharLyn was ignorant of the facts concerning the annuity overpayment.

52.     Prior to this meeting, SharLyn never had any knowledge that the annuity payments to the First Hawaiian Bank Account were made because of the State Department's error.

53.     The State Department reached the conclusion that SharLyn was not at fault for any alleged annuity overpayment.  On March 12, 2013, an individual working under the control of the State Department wrote an e-mail that read in part: "I believe his name was Agent Daniel Yang, but I'm sorry I don't have the number.  He was stationed in Hawaii.  His office really went out of the way to try and accommodate Ms. Foo because they felt she was a 'free spirit' and 'just didn't know that she had to report her mother's death.'"

54.     To date, the State Department has never asserted the SharLyn was at fault for the alleged annuity overpayments.

55.     The State Department sent a letter, dated May 3, 2012 ("the May 3, 2012 Letter"), to SharLyn concerning the alleged overpayment of the annuity and seeking the return of $254,343.99.  The May 3, 2012 Letter did not "inform the individual of their right to contest the overpayment, their right to request a waiver of recovery of the overpayment, and the procedures to follow in case of such contest or request for waiver of recovery," as was required by 22 C.F.R.

§ 17.7(a). The Letter also did not indicate whether SharLyn could contest the overpayment or seek a waiver of recovery of any alleged overpayment, as was required by 22 C.F.R. § 17.7(a). Furthermore, there was no documentation with the letter to explain the basis of the alleged debt.

56.     In a further effort to resolve the issue, on June 26, 2012, SharLyn responded to the May 3, 2012 Letter. In her June 2012 letter, SharLyn's counsel provided an initial explanation of her understanding of the status of the annuity payments. In the letter, which was never been disputed by the State Department, SharLyn's counsel explained that SharLyn was unaware of the existence of any federal annuity payments prior to being informed of these by Agent Yang in January 2012.

57.     Around that time, SharLyn also prepared a statement to the State Department dated June 16, 2012. The statement confirmed SharLyn's factual understanding of the events. SharLyn also explained the significant financial burdens she had undertaken. For example, SharLyn explained: "I cannot refinance any loans to cover expenses. It was only with the lessened oversight of mortgage finance rules that I was able to do so after the divorce. The interest rates on the new loans range from 5.78% to 10%. I presently owe over $1.5 million in mortgage loans. In 2011, I tried to refinance at lower interest rates. Because of my debt to income ratio, my bank, the Bank of America, and my mortgage broker's lenders turned me down. Because of new lending policies, I can neither reduce interest rates nor get equity out."

58.     SharLyn's June 2012 statement was submitted to the State Department.

**The State Department Takes No Action for Almost Two Years**

59.     Almost two years passed before SharLyn again heard from the State Department, when it sent its second letter on March 11, 2014 ("March 2014 Letter"). SharLyn did not receive—and was not informed of—the March 2014 letter until April 1, 2014. Prior to the March

2014 Letter, the State Department did send a short letter dated July 10, 2012, acknowledging receipt of the June 2012 Letter from SharLyn's former counsel.

60.     In this subsequent letter, dated March 11, 2014, the State Department changed its calculation of the alleged overpayment.  Specifically, the State Department alleged that the total overpayment was now $311,703.00.  The State Department increased its previous calculation of the alleged overpayment by approximately $57,000.  The State Department also provided, for the first time, some documentation, which purports to establish the alleged overpayment.  At no time has the State Department authenticated any of the documents that purportedly show the alleged overpayments.  Nor has the State Department provide actual contemporaneous documentation to establish the monetary transfers.  Instead, the documents provided were allegedly Notices of Reclamation, prepared years—sometimes more than a decade—after the purported annuity overpayment.

### SharLyn Explains Why A Waiver Is Warranted

61.     On May 12, 2014, counsel for SharLyn sent a letter to the State Department.  Through this letter, SharLyn reiterated her position that the "State Department's action to recover an alleged annuity overpayment is against equity and good conscience and is administratively infeasible."  SharLyn noted several deficiencies with the State Department's earlier letter.  SharLyn also notified the State Department that she "intends to respond to the State Department's requested recovery payment with a detailed explanation and documentation further explaining why recovery of any alleged overpayment is unwarranted."

62.     On May 13, 2014, SharLyn filed a motion for an extension of time to file her appeal brief.  The State Department responded with a letter dated May 21, 2014, consenting to the request for additional time to appeal.

63.     The State Department also responded with a letter, dated May 16, 2014, from Christopher H. Flaggs, Acting Comptroller of the State Department.  In that letter, the State Department again did not dispute the merits of SharLyn's assertion that she was not at fault and that recovery of the overpayment would be administratively infeasible and against equity and good conscience.  The State Department repeated its position that the total debt was $311,703.  In the letter, the State Department acknowledged that the Comptroller's earlier letter of March 11, 2014, had "failed to include information regarding Ms. Foo's rights of appeal to the Foreign Service Grievance Board."

64.     On June 4, 2014, the Board ruled that the motion was moot, given the State Department's subsequent letter of May 19, 2014. In the same ruling, the Board ordered that SharLyn's appeal would be due July 18, 2014.

65.     On July 18, 2014, SharLyn filed her appeal memorandum with the Board, submitting numerous exhibits and evidence to support her request for a waiver of a recovery of the alleged overpayments.   In her appeal, SharLyn contended that "First, the State Department relied on an invalid rule to deny SharLyn's request for a waiver of the overpayment recovery."

66.     In her appeal memorandum filed July 18, 2014, SharLyn further argued that, "[s]econd, even if the rule precluding estate-based waivers were valid, the rule has no application here because, as a matter of law, the alleged overpayments were not made to an estate."  SharLyn argued that the alleged overpayments were made to account that, by operation of law, had been converted to being solely owned by SharLyn.

67.     In her appeal memorandum filed July 18, 2014, SharLyn further argued that, "[t]hird, the State Department has at no time disputed the merits of the requested waiver."  In the proceeding before the Board, the State Department has not submitted any evidence that

challenges the merits of whether a waiver is warranted due to equity and good conscience or administrative infeasibility.

68.     In her appeal memorandum filed July 18, 2014, SharLyn further argued that, "[f]ourth, even if the Board were to now consider a State Department objection to the requested waiver, SharLyn has established with substantial evidence she is without fault in the overpayments."  At no time has the State Department contended in the proceeding before the Board that SharLyn was at fault for the alleged overpayments.

69.     In her appeal memorandum filed July 18, 2014, SharLyn further argued that, "[f]ifth, even if the Board were to now consider a State Department objection to the requested waiver, SharLyn has established with substantial evidence that recovery of the annuity overpayment would be administratively infeasible."

70.     In her appeal memorandum filed July 18, 2014, SharLyn further argued that, "[s]ixth, and again if the Board were to now consider a State Department objection to the merits of the requested waiver, SharLyn established with substantial evidence that recovery of the overpayment would be against equity and good conscience."

71.     In her appeal memorandum filed July 18, 2014, SharLyn further argued that, "[s]eventh, the State Department has not met its burden of proving by a preponderance of the evidence that the full amount of the alleged overpayment did in fact occur."

72.     In her appeal memorandum filed July 18, 2014, SharLyn requested that the Board conduct a hearing and oral argument in the appeal, pursuant to 22 U.S.C. § 4136(1)(B) and 22 C.F.R. § 906.1.  On August 4, 2014, the State Department filed a letter memorandum by which it opposed SharLyn's request for a hearing.  The Board denied the request for a hearing on September 12, 2014.

73.     On August 21, 2014, SharLyn filed a Supplemental Appeal Memorandum, providing more evidence supporting her request for a waiver of the recovery of any alleged annuity overpayments.

74.     On September 10, 2014, the State Department served discovery requests on SharLyn, seeking a wide range of information, most of which the State Department had or knew already.

75.     On October 16, 2015, SharLyn served her objections and responses to the discovery requests because the discovery requests were, *inter alia*, unduly burdensome and harassing.

76.     On November 17, 2014, the State Department filed a motion to compel additional responses and production.  On December 10, 2014, SharLyn filed her opposition to the motion to compel.

77.     On January 29, 2015, the Board conducted a hearing at which the parties presented argument on the various issues.  On February 4, 2015, the Board issued a memorandum summarizing the hearing but did not produce a transcript of the hearing.

78.     On February 18, 2015, the State Department filed its memorandum in opposition, as directed by the Board after the hearing.

79.     On March 27, 2015, SharLyn filed a supplemental reply, with additional evidence supporting her request for a waiver of the recovery of the alleged overpayment.  As evidence supporting the supplemental reply and responding to the State Department's arguments, SharLyn submitted a letter dated March 18, 2015, from First Hawaiian Bank, which stated that "Sharlyn Foo was added to her mother's account as a co-owner on November 6, 1995."  This letter was

submitted in support of SharLyn's contention that any alleged annuity overpayments were not made to an estate.

80.     On April 1, 2015, and in response to an e-mail inquiry by the Board, the State Department by e-mail objected to SharLyn's supplemental reply and submission of additional evidence.  On April 7, 2015, SharLyn through counsel submitted a letter responding to the State Department's objection to SharLyn's supplemental reply and submission of additional evidence.

### The Board's Decision and Corrected Decision

81.     On May 27, 2015, the Board issued is first decision ("Decision") in SharLyn's appeal, attached as Exhibit A.  The Board denied the relief requested by SharLyn.

82.     In its Decision, the Board incorrectly found that "[SharLyn] has failed to carry her burden of showing by substantial evidence that [22 C.F.R. §] 17.7(a)(2) does not apply, and that she is therefore eligible to have her waiver request considered by the Secretary on the merits."

83.     In its Decision, the Board erroneously found "no basis to conclude that the Department's regulation is contrary to law."

84.     In its Decision, the Board incorrectly decided that Plaintiff "failed to carry her burden of showing by substantial evidence that [22 C.F.R. §] 17.7(a)(2) does not apply, and that she is therefore eligible to have her waiver request considered by the Secretary on the merits."

85.     Despite the letter from the First Hawaiian Bank, the Board incorrectly concluded that Plaintiff "produced no evidence to buttress" her argument that the alleged overpayments were made to a joint account.

86.     The Board incorrectly held that "the 'individual[s]' referred to in 22 U.S.C. § 4047(d) as being entitled to request and receive a waiver of an overpayment can only mean those individuals entitled by law to receive annuity payments in the first place. As appellant is

not such an individual, we find that she is not covered by the waiver provision in section 4047(d)."

87.     The Board also dismissed the State Department's motion to compel as moot.

88.     On June 3, 2015, the Board issue a corrected decision, attached as Exhibit B.  In the corrected decision, the Board again denied the requested relief.  According to the letter accompanying the Corrected Decision, "[f]our sentences were inadvertently omitted from the second full on page 16 of the Decision issued by the Board on May 27, 2015.

89.     With her administrative remedies fully exhausted, SharLyn brings this action for review and correction of the Board's Decision and Corrected Decision.

## COUNT I

**STATE DEPARTMENT AND FOREIGN SERVICE GRIEVANCE BOARD DECISIONS TO DENY THE REQUESTED WAIVER**

90.     Plaintiff adopts and incorporates by reference Paragraphs 1-88 of this Complaint, as if fully set forth herein.

91.     The Administrative Procedure Act requires that agency actions, findings, and conclusions shall be held unlawful and set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706.

92.     In the Board's Decision and Corrected Decision, the Board incorrectly denied Plaintiff's request for a waiver of recovery of the overpayment.

93.     Among other errors, the Board misinterpreted and misapplied the controlling evidentiary standard—the substantial evidence.

94.     Among other errors, the Board misconstrued the controlling statute, 22 U.S.C. § 4047(d), in ruling that SharLyn Foo is not eligible for a waiver.

95.     Among other errors, the Board failed to rule on the merits of SharLyn's request for a waiver of the recovery of any alleged overpayment, including whether a waiver was warranted due to equity and good conscience, or administrative infeasibility, and whether the State Department had proven the existence of an annuity overpayment.

96.     The Board abused its discretion in denying SharLyn's request for a hearing, thus denying SharLyn an opportunity to fully present the facts relevant to her case.

97.     Among other errors, the Board made findings and conclusions that are unlawful and should be set aside because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 22 U.S.C. § 4140(a), pursuant to which review is governed by 5 U.S.C. § 706 of the Administrative Procedure Act.

## COUNT II

### ULTRA VIRES FINAL AGENCY ACTION (5 U.S.C. § 706)

98.     Plaintiff adopts and incorporates by reference Paragraphs 1-95 of this Complaint, as if fully set forth herein.

99.     Under the Administrative Procedure Act, an agency action is invalid if, among other things, it is arbitrary, capricious, not in accordance with law, or in excess of statutory jurisdiction or authority.  5 U.S.C. §706(2)(A), (C).

100.     The Board concluded that 22 C.F.R. §17.7(a)(2) is a valid rule.

101.     In doing so, the Board ruled the SharLyn had failed to establish that her facts did not preclude application of the rule, thus denying SharLyn of any consideration on the merits of her request for a waiver.

102.    Pub. L. No. 96-465 § 807(d) (codified at 22 U.S.C. § 4047(d)), does not provide the State Department with the authority to preclude a waiver of the recovery of the overpayment when the overpayment was made to an estate.

103.    Therefore, 22 C.F.R. §17.7(a)(2) exceeds the scope and authority Congress granted to the State Department under the controlling law, including under 22 U.S.C. § 4047(d).

104.    Accordingly, 22 C.F.R. §17.7(a)(2) is invalid, either on its face or as applied, and cannot be the basis to deny SharLyn's request for a waiver of the recovery of any alleged overpayment, under 22 U.S.C. § 4047(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SharLyn Foo prays for a judgment against Defendants as follows:

A.    Review the Decision and the Corrected Decision by State and the Board consistent with applicable law;

B.    Declare that the Board's Decision of May 27, 2015, is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

C.    Declare that the Board's Corrected Decision of June 3, 2015, is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

D.    Declare that 22 C.F.R. § 17.7(a)(2) is invalid as *ultra vires* and unauthorized by law;

E.    Enjoin the Defendants from enforcing the challenged decisions, collecting the demanded alleged overpayments, and from assessing interest or any other penalties on those sums;

F.      Declaring that Plaintiff SharLyn Foo should be granted a waiver of the alleged annuity overpayments;

G.      Alternatively, remanding to the Board for the Board to correctly apply the law to in granting the requested waiver and instruct that the Board must conduct a hearing;

H.      Award Plaintiff such damages, with interest as allowed by law, as may be established by the evidence;

I.      Grant to Plaintiff costs, disbursements, and attorneys' fees, as warranted under the law;

J.      Grant such other and further relief as the Court may deem appropriate.


                        Respectfully submitted,



                           *Matthew J. Dowd*
                        _____
                        Matthew J. Dowd (D.C. Bar No. 998373)
                        Andrews Kurth LLP
                        1350 I Street, NW
                        Washington, D.C. 20015
                        (202) 662-2701
                        MatthewDowd@andrewskurth.com

                        *Attorney for Plaintiff*
                        *SharLyn Foo*


Dated:  November 20, 2015